**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**HARRISON DIVISION**

JAMES MICHAEL BOLGER,
Personal Representative of the Estate of
JONATHAN J. BOLGER, deceased,

      Plaintiff,

v.                                                        Case No.

UNITED STATES OF AMERICA,                 ***_JURY TRIAL DEMANDED_

      Defendant.

**COMPLAINT**

NOW COMES Plaintiff, JAMES MICHAEL BOLGER, Personal Representative of the Estate of JONATHAN J. BOLGER, deceased, by and through his attorneys, LAUX LAW GROUP, and, for his cause of action, alleges as follows:

INTRODUCTION

In the early morning hours of August 20, 2017, United States Park Ranger, DAVID SULLIVAN (hereafter "SULLIVAN"), shot and killed Jonathan J. Bolger (hereafter "BOLGER") at Campsite #3 at the Buffalo National River Park (hereafter "Buffalo River" or "park"). BOLGER was a guest at the park along with his girlfriend, ASHLEY SANTORO (hereafter "ASHLEY"), and her three (3) minor children, ages 9, 10 and 11. At the time BOLGER was shot by SULLIVAN, he had in his left hand an air pellet gun, pointed down toward the ground. At no time did BOLGER raise his air pellet gun at SULLIVAN or his partner, T. COLE (hereafter "COLE"). SULLIVAN did not warn BOLGER that the use of deadly force was imminent.

After the shooting, SULLIVAN told investigators that he shot BOLGER when BOLGER "suddenly and quickly" turned toward SULLIVAN "and raise[d] both his arms at [SULLIVAN]

1

with the – the gun still his left hand." However, this is statement is quickly proven false by SULLIVAN's own body camera video. Based on the video, BOLGER was not pointing anything in the direction of SULLIVAN or COLE at the time SULLIVAN shot him—he was in the process of opening the driver side door to his Ford truck. *See Image 1 below.*



Image 1: SULLIVAN's view of BOLGER just prior to shooting him.

Based on SULLIVAN's video, BOLGER was not even facing SULLIVAN's direction when SULLIVAN shot him. BOLGER was in the process of opening the door to his Ford truck. At no time did BOLGER ever point a firearm in the direction of SULLIVAN or COLE. At the time SULLIVAN shot BOLGER, BOLGER was not even facing in SULLIVAN's direction.

## JURISDICTION AND VENUE

1.     This Honorable Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1346, and under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et. seq.* (hereafter FTCA or "Act").

2.     Pursuant to 28 U.S.C. § 1402(b), venue is proper for the United States District Court, Western District of Arkansas, Harrison Division, as the acts and/or omissions described in the instant pleading occurred in Searcy County, which is within this Judicial District.

3.     In August 2019, Plaintiff, JAMES MICHAEL BOLGER (hereafter "PLAINTIFF"), filed an official claim under the FTCA related to the August 20, 2017 shooting

death of his brother, BOLGER, by SULLIVAN, a federal employee, by submitting a Standard Form 95 (SF 95) to the United States Department of the Interior (DOI).  See PLAINTIFF's August 14, 2019 Correspondence and SF 95 Materials, attached hereto as **Exhibit 1.**  In February 2020, the DOI's Office of the Solicitor (DOI-OS) denied PLAINTIFF's claim via certified letter.  See February 27, 2020 DOI-OS Denial Correspondence, attached hereto as **Exhibit 2.**

4.      PLAINTIFF has thus exhausted his administrative options prior to the filing of the instant lawsuit.  PLAINTIFF has otherwise performed all acts precedent to bringing this suit or such acts have been waived.

PARTIES

5.      At all times material hereto, PLAINTIFF was BOLGER's brother and also the court-appointed administrator of the Estate of Jonathan J. Bolger.  See August 10, 2018 Taney Co., Missouri Circuit Court Probate Division Letters of Administration, Case No. 1846-PR00147, *In the Estate of Jonathan J. Bolger, deceased*, attached hereto as **Exhibit 3.**  At all times material hereto, PLAINTIFF was a citizen of the United States and resident of the State of Missouri.

6.      At all relevant times, BOLGER was a citizen of the United States of America and was, therefore, entitled to all legal and constitutional rights afforded citizens of the United States of America.

7.      Each of BOLGER's heirs-at-law, namely, PLAINTIFF (biological brother), Linda Bolger (biological mother), and Gerald Bolger (biological brother), are citizens of the United States of America and, therefore, entitled to all legal and constitutional rights afforded citizens of the United States of America.

8.      PLAINTIFF brings this action on behalf of the Estate of Jonathan J. Bolger and on behalf of all of BOLGER's heirs-at-law.

3

9.     Defendant, UNITED STATES OF AMERICA (hereafter "DEFENDANT"), is an appropriate party pursuant to a claim for relief under the FTCA and is responsible pursuant to said Act for the negligence and torts of its officials, agents, employees and/or departments.

10.     At all relevant times, including August 20, 2017, SULLIVAN was a United States Park Ranger ("Park Ranger") and federal employee working for the United States National Park Service ("NPS") at Buffalo River in Arkansas.

11.     In August 2017, SULLIVAN was an "officer of the United States empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law" and was therefore an "investigative or law enforcement officer," per 28 U.S.C. § 2680(h).

12.     In August 2017, SULLIVAN was also a Training Officer at Buffalo River, meaning he was authorized by his superiors to train and instruct Field Training Rangers (FTRs) on various aspects of the responsibilities assigned to Park Rangers in the course of their official duties.  At all relevant times, including August 20, 2017, SULLIVAN and COLE acted within the course and scope of their employment and under color of law.  At all relevant times, including August 20, 2017, SULLIVAN and COLE were agents, employees and/or servants of DEFENDANT, and acted on behalf of DEFENDANT, in their capacities as Park Rangers.

## DOI-NPS HISTORY, STRUCTURE AND PURPOSE

13.     The DOI is a federal executive department within the federal government apparatus of DEFENDANT.  The NPS is an agency of DEFENDANT and an operating unit of the DOI.  The NPS was established by the NPS Organic Act (16 U.S.C. §§ 1-4).  The NPS Organic Act directs the NPS to:

> …promote and regulate the use of Federal areas known as national parks, monuments and reservations…by such means and measures as conform to the fundamental purpose of the said parks, monuments and reservations, which purpose is to conserve the

4

> scenery and the natural and historic objects and the wild life therein
> and to provide for the enjoyment of the same in such manner and by
> such means as will leave them unimpaired for the enjoyment of
> future generations.

14.     The United States Congress has authorized the designation of certain employees as law enforcement officers, with the responsibility to "…maintain law and order and protect persons and property within areas of the National Park System" (16 U.S.C. § 1a6(b)).   To help in accomplishing this mission, the NPS employs two law enforcement branches: (1) United States Park Ranger (USPR) and Special Agent (SA); and (2) the United States Park Police (USPP).  United States Park Rangers are law enforcement officers.

15.     As a Park Ranger at Buffalo River, SULLIVAN performed law enforcement duties that included, *inter alia*, enforcing the criminal laws of the United States, apprehending criminal suspects, performing criminal and internal investigations and conducting basic public safety checks.   In addition, Park Rangers, like SULLIVAN, are responsible for resource stewardship, education, and visitor use management.   The Park Ranger position occupied by SULLIVAN requires an NPS law enforcement commission and must be supervised by a commissioned supervisor.

## PERTINENT DOI-NPS POLICIES

16.     The NPS law enforcement program is managed and supervised in accordance with all applicable laws and regulations, including:

a)   *Department of the Interior Manual* Part 446 (hereafter "446 DM");

b)   all applicable Secretarial directives;

c)   the DOI NPS Management Policies; and

5

    d) Director's Order #9: Law Enforcement Program and Reference Manual #9 (hereafter "RM-9")(a) through d) hereafter collectively "policies").

17.    At all relevant times, including August 20, 2017, these policies were in effect and applied to all employees involved in the NPS law enforcement program, except U.S. Park Police.

18.    The objectives of the law enforcement program are articulated in <u>Chapter 1 of RM-9</u> (*Law Enforcement Program*).  It reads in pertinent part: the "objectives of the law enforcement program are primarily the detection and investigation of criminal activity, the apprehension and successful prosecution of criminal violators, and the prevention of criminal activities through resource education, public safety efforts, and deterrence."

19.    <u>Chapter 1 of RM-9</u> states that the "NPS program provides law enforcement in a consistent efficient, and effective manner to both serve and protect the public and protect resources. The program is directed toward the preservation of public order, safety, education, protection of resources, and tranquility."

DOI-NPS TRAINING AND STANDARDS

20.    Proper training is indispensable to safe and effective law enforcement, and NPS has established law enforcement officer standards in the form of policies, such as 446 DM.  The purpose of <u>Chapter 10 of 446 DM</u> (*Firearms and Other Defensive Equipment*) is to establish uniform policy concerning the standardization and use of firearms and other defensive equipment by all employees of the DOI who are engaged in law enforcement duties.

21.    <u>Chapter 10 of 446 DM</u> reflects its policy that all NPS employees engaged in law enforcement activities must be properly trained, armed and equipped.  Per <u>Chapter 10 of 446 DM</u>, law enforcement officers must responsibly and discriminately use firearms and other defensive

equipment in the performance of their duties, and NPS is required to hold every law enforcement officer accountable for his or her actions.

22.     Per Chapter 10 of 446 DM, only the minimal force necessary to effect and maintain public order, protect human life or property, and/or arrest will be used by its law enforcement officers.

23.     Per Chapter 10 of 446 DM, the DOI has established the minimum standards for law enforcement equipment, and equipment within each bureau/office is standardized to the extent feasible, except where special purposes require deviations.  Chapter 10 of 446 DM requires that only Government-issued and/or bureau/office-approved firearms and other defensive equipment be carried or worn by law enforcement officers while on duty.

24.     Per Chapter 10 of 446 DM, each bureau/office is required to ensure that each law enforcement officer receives, at least, the minimum standard issue of law enforcement equipment. Chapter 10 of 446 DM requires that each bureau/office establish necessary defensive equipment standards and specify the type of defensive equipment to be used by its law enforcement officers.

25.     In Chapter 7 of RM-9 (*Law Enforcement Training Standards*), the NPS states that it provides law enforcement training in conformance with laws and Departmental policy and ensures that all NPS commissioned employees meet these requirements.  Per Chapter 7 of RM-9, commissioned employees begin their careers in NPS law enforcement with an approved basic training program designed to meet the basic training needs of their positions.

26.     Chapter 7 of RM-9 requires continued training of law enforcement officers on an annual basis to ensure skills proficiency and current knowledge of law enforcement issues, and to provide other additional skills.

27.     Per <u>Chapter 7 of RM-9</u>, the basic law enforcement training requirement for permanent Park Rangers is successful completion of the Land Management Police Training (LMPT), plus successful completion of the Ranger Specific Basic Training Program (RSBTP) and NPS Field Training and Evaluation Program (FTEP).

28.     At all relevant times, the NPS maintains that it provides progressive and realistic firearms training to all commissioned employees.  Per <u>Chapter 7 of RM-9</u>, a minimum of eight (8) hours of firearms skills training is provided annually to nonsupervisory commissioned employees. Training topics include weapons tactics and other weapons skills not requiring actual firing of firearms.  NPS law enforcement officers are given both day and night firearms training.

29.     SULLIVAN was trained in the use of force, including firearms, in the performance of his duties as a federal law enforcement officer.

30.     As reflected in <u>Chapter 2 of 446 DM</u> (*Personnel Qualification and Standards*), all entry-level law enforcement personnel and all criminal investigators shall successfully complete the prescribed training course at the Federal Law Enforcement Training Center (FLETC) or any other approved Federal law enforcement training program.  Per policy, each law enforcement officer shall thereafter receive a minimum of 40 hours of "in-service" law enforcement training each year, which may include up to eight (8) hours of firearms training.

31.     Per <u>Chapter 2 of 446 DM</u>, *inter alia*, all law enforcement officers shall:

- be punctual in reporting for duty at the time and place designated by superior officers;

- familiarize themselves with all pertinent provisions of statutes, ordinances, regulations and Departmental, bureau/office rules, regulations and policies;

- when in uniform and requested to do so, provide their name and identification/badge number in a courteous and noncontroversial manner;

- be responsible for the proper performance of the duties assigned and for strict adherence to the rules and regulations adopted for governing bureau/office law enforcement programs; and

- be responsible for adherence to the Departmental Law Enforcement Code of Conduct.

32.     To help sustain the high level of public trust necessary for an effective law enforcement program, commissioned employees, such as SULLIVAN, are required to adhere to the DOI's law enforcement code of conduct and the standards of ethical conduct found in RM-9.

33.     Integrity and trustworthiness are crucial attributes for NPS law enforcement officers.  Per Chapter 2 of 446 DM, NPS law enforcement officers who are guilty of the following may be subject to immediate disciplinary action:

- willfully, knowingly, and/or negligently making an untruthful statement of any kind in any oral or written report pertaining to their official duties or making any untruthful statement before any court or to any authorized government official.

34.     The NPS also requires that nonsupervisory commissioned employees are tested in firearms qualifications and use of force.

<u>DOI-NPS USE OF FORCE POLICIES</u>

35.     FLETC trains federal law enforcement officers that violation of an agency policy indicates a breach of duty.  In the Eighth Circuit, courts hold that, while not dispositive of the issue of liability, violations of policy nonetheless may constitute evidence of negligent and/or willful and wanton conduct.

36.     It is understood that, while rare, there are times when Park Rangers may be faced with the decision of whether or not it is objectively reasonable to use deadly force in the course of their duties and, therefore, it is imperative that they be trained on the proper use of deadly force and the United States Constitution.

37.     Per <u>Chapter 10 of 446 DM</u> (*Firearms and Other Defensive Equipment*), a firearm may be discharged only as a last resort and when, in the considered opinion of the officer, there is imminent danger of death or serious injury to law enforcement officer or to another person.

38.     The NPS requires nonsupervisory commissioned employees receive annual training on Use of Force.  Per <u>Chapter 7 of RM-9</u> (*Law Enforcement Training Standards*), the NPS requires a "review of NPS and DOI policy on the use of force, including case law and current issues, and techniques directly affecting officer safety and survival.  Topics include participation in scenario-based force-on-force training that requires demonstration of decision-making skills.  This may be simulator-based training, judgment pistol shooting, etc.," with a two-hour minimum.

39.     <u>Chapter 10 of RM-9</u> (*Use of Force*) defines deadly force as "the use of any force (with or without firearms) that is likely to cause death or serious physical injury" and states that "[c]ommissioned employees may use deadly force only when the employee has an objectively reasonable belief, in light of the facts and circumstances confronting the employee, that the subject of such force poses an immediate danger of death or serious physical injury to the employee or another person."

40.     <u>Chapter 20 of 446 DM</u> (*Use of Force*) addresses the deadly force concepts of fleeing felons and verbal warnings.  Per <u>Chapter 20 of 446 DM</u>, deadly force may be used to prevent the escape of a fleeing subject if there is probable cause to believe:

- The subject has committed a felony involving the infliction of threatened infliction of serious physical injury or death; and

- The escape of the subject would pose an imminent danger of death or serious physical injury to the officer or to another person.

41.     Law enforcement officers are required to provide a verbal warning prior to using deadly force, if feasible.  Mirroring this legal requirement, Chapter 20 of 446 DM also mandates

10

verbal warnings, stating that if it is feasible, and if to do so would not increase the danger to the officer or others, a verbal warning to submit to the authority of the officer shall be given prior to the use of deadly force.

Training in Evidence Handling and Storage

42.     To advance the objectives found in Chapter 1 of RM-9 (*Law Enforcement Program*), federal officers must be knowledgeable in preserving evidence.  The importance of evidence in solving crimes and establishing objective facts surrounding deadly force incidents is well known and, therefore, NPS law enforcement officers are required to be trained in the handling and storage of evidence.  NPS law enforcement officers are also trained on Government-issued devices intended to record video and audio depictions of incidents.

43.     Chapter 7 of 446 DM (*Law Enforcement Training Standards*), sets forth the DOI policy for Evidence Handling and Storage.  It states that "[a]ll evidence shall be collected in a manner that is consistent with pertinent laws regulations, policies and established procedures" and further requires that each law enforcement program include procedures for the proper collection, recording, handling, safeguarding, storage and disposal of evidence.

44.     Per Chapter 7 of 446 DM, each law enforcement officer is responsible for ensuring the safe and proper collection, handling, safeguarding, inventory and storage of all evidentiary items taken into custody.

45.     Chapter 7 of 446 DM states that "[a]ll law enforcement bureaus/offices are responsible for safeguarding all property taken into custody until it is either released to the rightful owner according to established procedures or, if appropriate, disposed of in accordance with applicable laws and regulations."  Bureau/office heads are responsible for the safe and proper

storage of evidence, and they are required to ensure that the appropriate procedures and guidelines are established, including the safe collection, handling, accountability and storage of all evidence.

<u>Electronic Evidence Recording and Preservation</u>

46.     <u>Chapter 44 of RM-9</u> (*Law Enforcement Recording Devices*) "provides commissioned employees with directions for the proper use, management, storage, and retrieval of audio/visual media recorded for both mobile 'in-car' digital audio/video recorders (MVRs) and wearable audio/video recorders (WVRs) for the patrol function." Per <u>Chapter 44 of RM-9</u>, the proper use of MVR and WVR can provide useful criminal documentary evidence and can also help defend an officer in the event of an allegation of misconduct or civil litigation.

47.     The use of MVR and WVR by Park Rangers, such as SULLIVAN and COLE, accomplishes the following law enforcement objectives, *inter alia*: to accurately capture statements and events during the course of an incident; to assist the officer's ability to properly document and review statements and actions for both internal reporting requirements and for courtroom preparation and presentation; and to capture visual and audio information for use in current and future investigations.

48.     <u>Chapter 44 of RM-9</u> requires  commissioned NPS employees use NPS-authorized audio/video recording devices (AVRD) to assist in the performance of their law enforcement duties and to help provide an accurate and unbiased recorded account of an incident, where said AVRD are available and issued.

49.     Per <u>Chapter 44 of RM-9</u>, AVRD "shall be utilized to help provide accurate documentation of officer arrests, searches, and critical incidents (including documenting crime and accident scenes or other events that involve the confiscation and documentation of evidence or contraband)."

50.     Chapter 44 of RM-9 requires that all commissioned employees assigned to use AVRD adhere to the procedures outlined within the policy so as to maximize the effectiveness and utility of the MVR and WVR and the integrity of evidence and related documentation.

51.     Chapter 44 of RM-9 states that MVR and WVR "[e]quipment shall only be operated in accordance with the directives in this chapter and the manufacturer's recommended technical guidelines."

52.     Per Chapter 44 of RM-9, "[w]hen an officer fails to activate the AVRD, fails to record the entire contact, or interrupts the recording, the circumstances will be documented in the case report or violation notice."  It requires an officer to verbally indicate his or her intent to stop the recording, and the reason before deactivating the device, and upon reactivation, state that he or she has re-started the recording.

53.     Chapter 44 of RM-9 also covers repairs and malfunctions of AVRD, and states that "[p]roblems that cannot be remedied by the officer shall be documented and reported to a supervisor and devices taken out of service until repaired by the manufacturer or a certified repair vendor."  It requires that malfunctions, damage, or theft of AVRDs be reported immediately to a supervisor.

<u>BUFFALO NATIONAL RIVER PARK, HARRISON, ARKANSAS</u>

54.     At all times material hereto, DEFENDANT owned, controlled and operated Buffalo River, a National Park.  Established in 1972, Buffalo River flows freely for 135 miles and is one of the few remaining undammed rivers in the lower 48 states.  The national park features extensive camping grounds, as well as boating down the river from running rapids to quiet pools while surrounded by massive bluffs along the Ozark Mountains down to the adjacent White River.

13

55.     Buffalo River falls under the jurisdiction and control of the NPS.

56.     Buffalo River's 94,293 acres are divided into three (3) management districts: the Upper Buffalo Wilderness Area; the Ponca Wilderness Area; and the Lower Buffalo Wilderness Area.  *See Image 2 below.*  Park visitation averaged more than 800,000 visitors a year recently.  In addition to visitor water-based activities with multiple launch points along the river, Buffalo River offers more than 100 miles of hiking trails and designated trails for horseback riding.



**Image 2: Buffalo River Lower District Park Map**

57.     The Lower Buffalo Wilderness Area provides camping at Spring Creek, Buffalo Point, and Rush Campgrounds.  *See Image 2 above.* On August 20, 2017, Spring Creek Campground had at least eleven (11) designated sites, with a picnic table, fire ring, and lantern hook at each site.

58.    GPS coordinates are provided for each of the campgrounds at Buffalo River and can be found on the official NPS/Buffalo River website.  The GPS coordinates for the Spring Creek Campground are: 36.0285289; -92.5800835.

59.    As reflected in Section 512 of the Credit Card Accountability Responsibility and Disclosure Act of 2009, Public Law 111-24, 123 Stat. 1764-65, people who can legally possess firearms under applicable federal, state, and local laws may legally possess firearms at Buffalo River.  Per 36 CFR § 2.2 (b)(2) (*Wildlife Protection*), hunting is permitted at Buffalo River.  Thus, in August 2017, merely possessing a registered firearm on the grounds of Buffalo River was not illegal nor in violation of Buffalo River rules, a fact SULLIVAN and COLE each knew or should reasonably have known.

60.    At all relevant times, including August 2017, Park Rangers, such as SULLIVAN and COLE were expected to be familiar with the law, including pertinent portions of the U.S. Constitution and Arkansas law.  It was therefore foreseeable to SULLIVAN and COLE that they might encounter guests of Buffalo River with guns in their possession.

61.    At all relevant times, including August 2017, Karen Brandford (hereafter "Chief Ranger Brandford") was employed by DEFENDANT as a Chief Ranger (Senior Law Enforcement Officer (SLEO)) and was an "investigative or law enforcement officer," per 28 U.S.C. § 2680(h). At all relevant times, including August 20, 2017, Chief Ranger Brandford was a Park Ranger and acted within the course and scope of her employment and under color of law.  At all relevant times, including August 2017, Chief Ranger Brandford was an agent, employee and/or servant of U.S. and acted on behalf of DEFENDANT in her capacity as a Park Ranger and direct supervisor of SULLIVAN and COLE.

62.     At all relevant times, including 2017, Chief Ranger Brandford was SULLIVAN's direct supervisor at Buffalo River and was responsible for ensuring that SULLIVAN was properly trained in the use of force, including firearms in the performance of his duties as federal law enforcement officer. Chief Ranger Brandford was responsible for ensuring that SULLIVAN was properly trained in emergency situations, medical care and the use of certain medical equipment.

63.     At all relevant times, including 2017, Chief Ranger Brandford was trained and experienced in the supervision of federal law enforcement programs which includes ensuring that operational activities are in compliance with directives, policies, laws, standards and practices.  At all relevant times, including August 2017, Chief Ranger Brandford was a commissioned supervisor.

64.     At all relevant times, including August 2017, SULLIVAN was a firearms instructor.

65.     On August 19-20, 2017, COLE was an FTR with the NPS and was conducting his field training program at Buffalo River.  On August 19-20, 2017, COLE was in the second phase of the field training program.

66.     SULLIVAN implemented the body camera program that was in effect at Buffalo Nation Park River in August 2017.  He also wrote the policy for body cameras and got the policy he drafted—which was in effect in August 2017—approved through Chief Ranger Brandford.  At all relevant times, the body camera usage policy for body cameras to which Park Rangers, such as SULLIVAN and COLE, were subject, was the policy SULLIVAN himself drafted.

67.     By design, the body cameras worn by Buffalo River rangers in August 2017 were designed to capture video and audio recordings 30 seconds prior to activation of the body camera.

16

The 30-second audio pre-activation feature can be manually deactivated, which means that the only thing captured prior to activation is 30 seconds of soundless video.

68.     Prior to his August 19, 2017 shift, SULLIVAN deactivated the 30 second audio pre-activation feature of his body camera so that when his body camera was turned on, one would be unable to hear any audio from his body camera during the 30-second pre-activation timeframe. Prior to August 19, 2017, SULLIVAN assisted COLE with the set-up of COLE's body camera and deactivated COLE's 30 second audio pre-activation feature.

69.     At all relevant times, AVRD were available and issued to SULLIVAN and COLE. On August 20, 2017, SULLIVAN and COLE were equipped with WVR and MVR.

<u>BOLGER AND ASHLEY ARRIVE AT BUFFALO RIVER,<br>SPRING CREEK CAMPGROUND, CAMPSITE #3</u>

70.     BOLGER, ASHLEY and ASHLEY's three (3) minor children arrived at Buffalo River on August 19, 2017, at approximately 4:30 p.m.  BOLGER and ASHLEY had planned the Buffalo River outing as a reward for ASHLEY's kids several weeks earlier.  They had visited Buffalo River previously and, with the exception of a brief episode with an aggressive raccoon on the last trip, they always enjoyed themselves.  The group settled in at Campsite #3 of the Spring Creek Campground, in the lower district of Buffalo River.  *See Image 2 above.*

71.     Based on their prior experience, BOLGER and ASHLEY understood Park Rangers' shifts to end at 11:30 p.m., barring emergency circumstances.  Throughout the August 19, 2017, and even into the evening, it rained considerably, which caused mud and softened the terrain underneath the grass at the park.

72.     Regardless of what did or did not transpire at BOLGER and ASHLEY's campsite, SULLIVAN and COLE had no knowledge of BOLGER or ASHLEY, or anything that may have transpired at their campsite, prior to SULLIVAN's shooting of BOLGER.

17

<u>SULLIVAN AND COLE'S 11-HOUR OVERTIME SHIFT</u>
<u>WHICH PRECEDED THE SHOOTING</u>

73.     On August 19, 2017, SULLIVAN was scheduled to work an 8-hour shift, from 3:30

p.m. to 11:30 p.m. Even though SULLIVAN was told by dispatch to refrain from unnecessary

activity during the beginning of his shift, he nonetheless actually decided to start work an hour

early, drawing overtime wages, paid by American taxpayers.  SULLIVAN and COLE thus began

their shift as Park Rangers at Buffalo River at 2:30 p.m.

74.     Starting around 3:30 p.m., SULLIVAN and COLE were on Buffalo River for

several hours, engaging in many park activities and tasks spanning nine (9) hours to 11:30 p.m.,

including:

- Deploying their boats in river waters and engaging boaters for several hours;

- Checking Buffalo River guests' boats for rule and specs compliance;

- Verifying that all encountered vessels contained required equipment;

- Trailering a boat approximately 30 miles from Harrison, AR to Yellville, AR;

- Filling the boat with gas in Yellville, AR;

- Traveling to a maintenance shop around 8:00 p.m. in order to service a trailer;

- Performing a vehicle stops, including one for a traffic violation by a young woman who was let go with a verbal warning;

- Traveling to Rush Landing around 10:00 p.m. to ensure quiet hours were observed;

- Engaging several Buffalo River guests who were in violation of minor park rules;

18

- Writing several tickets to Buffalo River guests for violations of park rules;

- Encountering a domestic incident transpiring between a woman and her boyfriend;

- Assisting Buffalo River guests with campsite payment issues;

- Audibly detecting the usage of fireworks and traveling to the campsite from where the fireworks originated;

- Engaging the visitors who set off the fireworks, determining that they were also in possession of other contraband; and

- Writing out twelve (12) citations to four (4) individuals found to be in possession of contraband.

.

75.     SULLIVAN and COLE's normal 8-hour shift ended at 11:30 but SULLIVAN again wanted to make overtime money, so he decided that he and COLE would work more overtime hours after their modified 9-hour shift (which includes one hour of pre-shift overtime) was complete.  SULLIVAN's purported reasoning for his and COLE's taking post-shift overtime was to further COLE's training.

76.     SULLIVAN's supervisor, Chief Ranger Brandford, was aware of SULLIVAN's decision to clock in early at an overtime wage and stay late at an overtime wage, and permitted him to do so, or otherwise ratified SULLIVAN's decision or acquiesced to SULLIVAN.

77.     On August 19, 2017, around 11:30 p.m., the time when their shift should normally end, SULLIVAN and COLE left Rush Landing and went down to Buffalo Point.  *See generally Image 2 above.*  Around 12:30 a.m., they encountered a park guest passed out and gave him a verbal warning after he awoke.

78.     After the 12:30 a.m. encounter, SULLIVAN and COLE traveled further down the river and saw another group of guests with fireworks and marijuana.  COLE wrote out citations to

the guests for possession of a controlled substance.  SULLIVAN and COLE then drove back to the Buffalo Point Ranger Station to log the seized contraband evidence.  *See Image 2 above.*

79.      Although by starting early and staying late SULLIVAN and COLE's August 19-20 shift was a full work day by any reasonable measure, SULLIVAN nonetheless decided at approximately 1:00 a.m. that he and COLE would make the approximately 30 minute drive from the Buffalo Point Ranger Station to Spring Creek to perform public safety checks at the campsites there.  There is no curfew at Buffalo River but there  are quiet hours which start at 10:00 p.m. and end at 6:00 a.m. the following morning.

<u>LOGGING OVERTIME HOURS, SULLIVAN AND COLE ARRIVE AT
SPRING CREEK CAMPGROUND AT APPROXIMATELY 1:30 AM</u>

80.      SULLIVAN and COLE arrived at Spring Creek Campground at approximately 1:30 a.m.  Although SULLIVAN purportedly went to the Spring Creek Campground for public safety, he instructed COLE to park their NPS vehicle, which contained first aid and life-saving equipment, approximately 200 feet away from the campsite entry point and even further from anyone they encounter who may need medical assistance.

81.      SULLIVAN instructed COLE to park far away because he knew a public safety sweep at this hour was out of the ordinary and he wished for neither he nor COLE to be detected and for neither of them to be compelled to identify themselves as law enforcement officers, per policy.  SULLIVAN and COLE were each wearing body armor at the time they arrived at the campground.

82.      By parking approximately 200 feet away from the campsite entry, SULLIVAN and COLE knew, or should have known, that in the event of a medical emergency, there would be an unreasonably long distance between themselves and the emergency medical equipment in their locked ranger truck.  SULLIVAN and COLE knew, or should have known, that with each step

20

toward the campsites they might take, they would increase the distance between themselves and emergency medical equipment contained in the locked ranger truck, making it less accessible to someone potentially in need.

83.     On August 20, 2017, at 1:32 a.m., from inside the ranger truck, SULLIVAN radioed dispatch and announced that he would be doing an afterhours sweep of the campgrounds. Specifically, SULLIVAN said "*You can show us on foot Spring Creek Campground.*"   The purported purpose of the sweep of Spring Creek Campground ultimately was to ensure public safety.

84.     Still inside the ranger truck, SULLIVAN grabbed an oversized flashlight to use during his afterhours sweep.   However, as he acknowledged in a later official statement, SULLIVAN had never been trained on the proper usage of the oversized flashlight prior to August 20, 2017, nor trained on the propriety of using the oversized flashlight and a firearm simultaneously.

85.     Neither SULLIVAN nor COLE were aware of any complaints, calls or reports made regarding any incidents at Campsite #3 on August 19 or 20 prior to their arrival at the campsites.  Neither SULLIVAN nor COLE knew, or were familiar with, BOLGER or ASHLEY prior to their arrival at the campsites.  Neither SULLIVAN nor COLE received any complaint, call or report regarding BOLGER or Campsite #3 on August 19 or 20 prior to their arrival.

86.     BOLGER violated no laws on August 20, 2017.

87.     Neither SULLIVAN nor COLE ever told BOLGER that he was under arrest. Neither SULLIVAN nor COLE obtained or sought to obtain any type of arrest warrant pertaining to BOLGER.

21

88.     Upon exiting the ranger truck, SULLIVAN and COLE both experienced purported difficulties "adjusting" to the darkness, which significantly impaired their vision, according to later official statements given by them.   Despite this visual impairment, SULLIVAN and COLE proceeded to approach the campsites prior to the completion of their eyes adjusting which placed themselves and those they might encounter in unnecessary danger.

89.     SULLIVAN and COLE began the approximately 200-foot walk from the location of their ranger truck to the entry of the campsites.   After a while, SULLIVAN began to rush toward the campsites in the dark at such a brisk pace that COLE, who was less familiar with the area, struggled to keep up with SULLIVAN and felt as though he was endangering himself trekking through forest.   Both SULLIVAN and COLE were using illuminated flashlights as they entered the campsites and approached Campsite #3.

90.     Though COLE drove the vehicle, after they exited the ranger truck and locked it up, SULLIVAN took possession of the key fob, which is necessary to operate the vehicle.

91.     When SULLIVAN and COLE reached Campsite #3, it was quiet with no indication of any trouble.   There was no indication that anyone was in violation of quiet hours.   In fact, BOLGER, ASHLEY and the three (3) minors were the only guests at Campsite #3 at the time of SULLIVAN and COLE's afterhours sweep.

92.     Although Campsite #3 was quiet and there was no indication of anyone violating Buffalo River's quiet hours, SULLIVAN and COLE continued toward Campsite #3, the campsite occupied by BOLGER, ASHLEY and the minor children.   At the time SULLIVAN and COLE arrived at the campsites, BOLGER's Ford pickup truck was parked adjacent to Campsite #3, just a few feet off of the road.

93.     Though SULLIVAN and COLE were quiet so as to not be noticed, BOLGER saw their flashlights through the woods to his right as they approached Campsite #3.  BOLGER, who was sitting at the campsite picnic table at the time, watched SULLIVAN and COLE approach through the trees, their flashlights illuminated and bobbing along with the shadowy figures' movements toward him.  *See Image 3 below.*



**Image 3: Campsite #3, where BOLGER and ASHLEY set up their tents.  Image 3 depicts the park bench from where BOLGER saw SULLIVAN and COLE approach.**

94.     BOLGER did not know the identity of the individuals who were shining their flashlights—SULLIVAN and COLE—but he believed, like ASHLEY, that the individuals may be the occupants of a truck that stopped in the area earlier and drove away.  BOLGER left the picnic table and walked toward the flashlights.

95.     When BOLGER left the picnic table and walked past the orange tent and toward the flashlights held by SULLIVAN and COLE, he had nothing in his hands.  *See Image 3 above.*

<u>SULLIVAN'S AUGUST 20, 2017 SHOOTING OF BOLGER</u>

96.     When SULLIVAN and COLE detected BOLGER and shined their flashlights on him.

97.     After SULLIVAN and COLE shined their flashlights on BOLGER, they then drew their service weapons and pointed them at BOLGER.

98.     Both SULLIVAN and COLE wore body cameras during their August 19-20, 2017 shift.   Combined, SULLIVAN and COLE's body cameras captured video footage starting at approximately twelve (12) seconds prior to SULLIVAN shooting BOLGER and approximately thirty (30) minutes after the shooting.   The first images of BOLGER depict him shielding his eyes with his right forearm over his eyes and his left arm at his side, straight down, with his hand pointing downward.   *See Image 4 below.*



**Image 4: SULLIVAN and COLE spot BOLGER near his Ford pickup truck and shine their flashlights on him, causing him to shield his eyes with his right hand.  BOLGER's left hand is at his side, hand pointing downward.**

99.     After shielding his eyes from SULLIVAN's flashlight beam, BOLGER began to turn to his left, toward his Ford pickup truck.   *See Image 5 below.*

24



**Image 5: BOLGER lowers his right arm from near his face, preparing to open the driver side door of his Ford pickup truck.**

100.    BOLGER continued to his left, away from SULLIVAN, and stretched his right hand toward the driver side door handle of his Ford pickup truck. *See Image 6 below.*



**Image 6: BOLGER's right arm is parallel to the ground as he takes a second step toward his pickup truck, reaching for the driver side door handle.**

101.    BOLGER stopped his movement to his left, away from SULLIVAN and grabbed hold of the driver side door handle of his Ford pickup truck. *See Image 7 below.*



**Image 7: BOLGER stops at his Ford pickup truck and his right hand makes contact with his drive side door handle.**

102.    After grabbing hold of the driver side door handle of his Ford pickup truck with his right hand, BOLGER began to pull on the handle to open the door.  *See Image 8 below.*



**Image 8: With his right hand, BOLGER pulls on the driver side door handle of his Ford pickup truck**.

103.    As BOLGER pulled on the driver side door handle of his Ford pickup truck, he was shot and killed by SULLIVAN without warning.  *See Image 9 below.*

26



**Image 9: BOLGER continues to pull the driver side door handle of his Ford pickup truck at the moment he is shot and killed by SULLIVAN.**

104.    When SULLIVAN and COLE shined their flashlights on BOLGER, he likely had a pellet gun in his left hand which, at all times following his detection by SULLIVAN and COLE, was pointed downward, toward the ground, and never in the direction of SULLIVAN or COLE. Alternatively, BOLGER had a flashlight on his person when SULLIVAN and COLE shined their flashlights on him, and it was pointed down toward the ground at all times.

105.    BOLGER did not raise both of his hands toward SULLIVAN or COLE when SULLIVAN shot BOLGER.

106.    BOLGER did not raise either of his hands toward SULLIVAN or COLE when SULLIVAN shot BOLGER.

107.    BOLGER's right hand was on the door handle of his Ford truck when SULLIVAN shot him.

108.    BOLGER was not facing either SULLIVAN or COLE when SULLIVAN shot and killed him.

109.    On August 20, 2020, at 1:34 a.m., after shooting BOLGER, SULLIVAN got on his dispatch radio and yelled "*MROCC, shots fired!  MROCC shots fired!*"

<u>AFTER THE SHOOTING OF JONATHAN BOLGER</u>

110.    ASHLEY was approximately forty feet away from BOLGER when SULLIVAN shot and killed BOLGER.  She saw nothing in BOLGER's hands when he got up from the picnic table and approached SULLIVAN and COLE's illuminating flashlights.

111.    ASHLEY did not hear anyone yell "Police" or words like it prior to SULLIVAN shooting BOLGER.

112.    ASHLEY, a licensed practical nurse (LPN), was horrified by the shooting of her boyfriend, BOLGER, especially with her minor children in close proximity.  She immediately asked to provide emergency medical treatment to BOLGER but was held off at gunpoint by SULLIVAN and COLE.

113.    Even though BOLGER was quickly handcuffed after the shooting and even though ASHLEY repeatedly informed SULLIVAN that she was a LPN capable of providing emergency medical care, SULLIVAN ordered ASHLEY not to come near the scene of BOLGER's body for approximately three (3) minutes after the shooting.

114.    During those three (3) minutes, SULLIVAN had exclusive and unfettered access and control over to the crime scene.

115.    While it is true that after the shooting ASHLEY told the investigators that BOLGER had a "BB gun" on his person when SULLIVAN shot him, this was secondhand information she got from SULLIVAN while she was asking to help save BOLGER's life.

116.    The audio from SULLIVAN's AVRD captured SULLIVAN and COLE keeping ASHLEY away from the scene.  Once ASHLEY was allowed near BOLGER's body, SULLIVAN provided her with his false account of the BOLGER pointing the air pellet gun at him:

ASHLEY:     Jon.

28

COLE:   <u>Don't move.</u>

ASHLEY:  Can I please check on him?

SULLIVAN: <u>Stay where you are.</u>

ASHLEY:  I'm a nurse.  Can I please check on him?  I swear to God I'm a nurse.  Can I please…

SULLIVAN: <u>Stay there don't move.</u>

ASHLEY:  Please.

*****

ASHLEY:  Please.

COLE:   <u>Stay there don't move.</u>

ASHLEY:  I'm not moving, but can you please check on him.

COLE:   <u>Stay there.</u>

*****

ASHLEY:  Can you please tell me if he's hurt?

*****

ASHLEY:  Can you please tell me if he's hurt?

*****

SULLIVAN: Are you a nurse?

ASHLEY:  Yes I am.  I've been a nurse for five years.  I'm an LPN.

SULLIVAN: All right get over here.  Get over here.  Let me see your person, let me see your person.

ASHLEY:  I don't.

SULLIVAN: Do you have anything on your person?

ASHLEY:  No I swear I do not.  I have.

29

***** 

SULLIVAN:   …Are there any other weapons here?

ASHLEY:   No. That was a BB gun because there's a raccoon out here.

SULLIVAN:   Well I didn't know that.

ASHLEY:   I know you didn't.

SULLIVAN:   <u>I just know you had a gun pointed at me.</u>

ASHLEY:   <u>Oh.</u>

SULLIVAN:   I have to make sure you don't have anything.  Go ahead and render aid.

ASHLEY:   Where did you shoot him?  No – no – no – no – no – no – no.  Is he okay?

SULLIVAN:   Can you render aid or no?

ASHLEY:   (Unintelligible) please don't know – no – no – no – no – no – no.

SULLIVAN:   All right, ma'am.  Ma'am, if you can't help out I don't want you to deal with this.

ASHLEY:   No I got – wait – wait – wait.  (emphases added)

117.   After BOLGER was shot by SULLIVAN, SULLIVAN told ASHLEY "*I just know you had a gun pointed at me,*" even though he knew that statement to be false.  SULLIVAN falsely told ASHLEY that BOLGER pointed a gun at him when SULLIVAN shot him in order to justify shooting a man who poses no reasonable threat of imminent death or serious physical injury.

118.   While trying to provide life-saving measures to BOLGER, ASHLEY asked SULLIVAN to remove BOLGER's handcuffs, but SULLIVAN refused on more than one occasion, stating "*[i]t's not gonna matter right now.*"  When ASHLEY told SULLIVAN that she

needed the handcuffs off so that BOLGER would be flat on his back—thus maximizing BOLGER's lessening chance of survival—SULLIVAN shot back, "*[h]e's flat*."

119.    Throughout post-shooting ordeal, SULLIVAN and COLE were clearly unfamiliar with, *inter alia*: the location of their medical equipment within their equipment bags; the proper usage of their medical equipment; and the GPS coordinates for the area where BOLGER was in need of emergency medical care.

<u>ARKANSAS STATE POLICE INVESTIGATION OF<br>THE SHOOTING OF JONATHAN J. BOLGER</u>

120.    On August 20, 2017, at 1:54 a.m., approximately twenty (20) minutes after the shooting, Deputy Aaron Leavins of the Searcy County Sheriff's Office (SCSO) arrived at the scene and made contact with SULLIVAN.  SULLIVAN advised Deputy Leavins that his body worn camera was "*recording just so you know*," and proceeded to tell Deputy Leavins that BOLGER "*came out of nowhere and had a pistol pointed at us*."  SULLIVAN told Deputy Leavins that he did not touch the scene.

121.    A few moments into his discussion with SULLIVAN, Deputy Leavins noticed an air pellet gun on the ground, many feet away from BOLGER's body, in the middle of the gravel roadway next to the campsite.  When SULLIVAN became aware that Deputy Leavins noticed the air pellet gun, SULLIVAN told Deputy Leavins that he moved it from the area near BOLGER's body.  Deputy Leavins then retrieved a plastic bag and put the air pellet gun in the bag where it presumably remained until the criminal investigation of BOLGER's homicide.  *See Images 10 and 11 below.*



**Image 10: Photo of the pellet gun where it was discovered by a Searcy Co. deputy several feet from BOLGER's body.**



**Image 11: Photo of the pellet gun on top of the plastic bag in the road later on the Morning of August 20, 2017.**

122.    On August 20, 2017, at approximately 4:00 a.m., troopers with Arkansas State Police (ASP) arrived at Campsite #3 and took control of the crime scene and began their investigation of BOLGER's homicide.  Corporal David Small, a Special Agent with ASP, advised NPS investigators that he did not collect nor see a flashlight in the immediate area where BOLGER's body was located.  Deputy Leavins later stated that he did not see a flashlight in the vicinity of BOLGER's body either.  NPS also performed an investigation of the shooting.

123.    Five days after the shooting, on August 25, 2017 at 10:30 a.m., SULLIVAN was questioned by NPS investigators.   During the questioning, he gave the following statement regarding the moments immediately prior to the shooting:

> Um, I dropped my flashlight at that point in time to get rid of it.  I got both hands on the gun.  And the suspect was walking backwards. Um, I remember him saying – the suspect saying, uh "No, uh, show me your badge."  And at that point again, I yelled, "Police, drop the gun.  Police drop the gun," <u>as I'm still moving to my right and he's still backing up</u>.  <u>And then suddenly and quickly, he turns towards</u>

me and raises both his arms at me with the – the gun still in his left
hand.  At that point, I fired.

124.    According to SULLIVAN, after he shot BOLGER, he saw a "handgun" on the

ground near BOLGER's right hand.  He described finding the weapon to investigators:

> And when he fell, he fell onto his back with his head facing towards
> me.  I remember at that time, yelling to [COLE] "Cover me.  Cover
> me."  And trying t- to advance in on the subject.  I could see his arms
> are – are out to his side and the handgun was outside of his right
> hand only about two or three inches, laying on the ground.  Up until
> that point, it was – the handgun was just almost underneath the truck.
> It was, like, right beside the driver's door.  I didn't even remember
> seeing the truck up until that point.  I had tunnel vision so much on
> the – the gun itself.  [COLE] told me that he – he had me.  He was
> like, "I got you.  I got you."  I remember advancing in on the suspect
> with my weapon still drawn on him.  And I reached over and
> grabbed the handgun.  I stepped back and tried to put it into my left
> cargo pocket.  And that's where I remember putting it.  And I
> remember at that point, calling dispatch and saying, "Shots fired.
> Shots fired."

125.    According to SULLIVAN, he removed the gun from the ground near BOLGER's

right hand prior to reporting shots fired to dispatch.

126.    Investigators asked SULLIVAN about Deputy Leavins finding the air pellet gun on

the ground several feet from BOLGER's body, approximately twenty (20) minutes after the

shooting and what SULLIVAN may have done with the gun he allegedly found on the ground near

BOLGER's right hand:

> CARLISLE:   And after – and after the event took place and you
> made that – you made that point safe, did you do –
> did you do anything with his weapon?
>
> SULLIVAN:   I remember putting it in my left cargo pocket when I
> stepped back away from [BOLGER].
>
> CARLISLE:   Okay.
>
> SULLIVAN:   And then, um, after Searcy County showed up on
> scene and were relieving us of everything, I

<u>remember a deputy looking at me and being like, "Is that the gun?"  And it was on the ground on the roadway.  And I remember looking at it and saying, "Yeah, that's the gun," and checking my cargo pocket.</u>

PAXTON:     Okay.

SULLIVAN:  <u>I didn't even realize it fell out.</u>

CARLISLE:  Ah- okay.

SULLIVAN:  <u>Or if when I was standing on the road and I thought I put it in, I completely missed my pocket and dropped it on the ground.</u>  (emphases added)

127.    One of the investigators asked SULLIVAN about the hand in which BOLGER allegedly held the gun:

CARLISLE:  <u>Did – did you say that at – at some point, the weap- that the weapon on [BOLGER] went from one hand to another hand?</u>  Did I catch that?  You s..

SULLIVAN:  <u>I don't remember saying that.</u>

CARLISLE:  Okay.

SULLIVAN:  I don't…

CARLISLE:  I – I don't know.  And that's why I'm asking.  I'm not saying you said that.

PAXTON:     Uh…

CARLISLE:  Was it always – the -the weapon you saw – when you saw him – when you saw him point the gun at [COLE] as you were ma- as you're making your move.

SULLIVAN:  I just remember an arm being up and the – the – the profile of him pointing it.  But I…

*****

34

SULLIVAN:   But I can't recollect at that point – I just remember seeing an arm up and I – <u>I feel like in my memory that it would be a right hand.</u>  But I don't know if that's just…

CARLISLE:   Sure.

SULLIVAN:   just the way I would imagine somebody pointing a handgun.

CARLISLE:   Of course.  (emphases added)

128.    SULLIVAN initially told NPS investigators that BOLGER held the air pellet gun in his left hand.  However, later in his statement, after the investigator suggested that BOGER switched hands, SULLIVAN changed his story and stated "…I feel like in my memory that it would be a right hand."

129.    SULLIVAN told investigators that he did not see a flashlight anywhere near BOLGER's body after the shooting.  SULLIVAN told investigators he "just remember[ed] seeing the handgun just outside of [BOLGER's] right hand…And [he] collected it."

130.    SULLIVAN told investigators that he did not see BOLGER's truck or realize it was even there until after the shooting.

131.    Though SULLIVAN and COLE each had fully functioning AVRD available to them at all times during their shifts, neither of them nor DEFENDANT is in possession of any audio recording wherein SULLIVAN or COLE identify themselves as police officers.

132.    Though SULLIVAN and COLE each had fully functioning AVRD available to them at all times during their shifts, neither of them nor DEFENDANT is in possession of any audio recording wherein SULLIVAN or COLE gave BOLGER a verbal warning that deadly force was forthcoming.

133.    Though SULLIVAN and COLE each had fully functioning AVRD available to them at all times during their shifts, neither of them nor DEFENDANT is in possession of any video footage wherein BOLGER points a gun or any object in the direction of SULLIVAN or COLE.

134.    On August 22, 2017, Dr. Stephen A. Erickson of the Arkansas State Crime Laboratory (ASCL) performed an autopsy on BOLGER.  Based on the autopsy report in ASCL Case No. 2017-020262/ME-1028-17, BOLGER suffered four (4) gunshot wounds from three (3) of the four (4) gunshots fired by SULLIVAN:

- One (1) gunshot wound through BOLGER's right upper arm, and forearm, exiting eleven (11) inches down at the wrist;

- One (1) gunshot wound to BOLGER's right back with a bullet path causing damage to his liver, lower lung lobe and right ventricle of the heart, passing out of the pericardial sac and lodging in the sternocostal margin of the left 5th rib;

- One (1) gunshot wound to the lateral right abdominal flank, through his abdominal wall and large bowel; and

- One (1) gunshot wound left wrist, in all likelihood from the exiting bullet of a prior gunshot wound.

135.    One of the gunshots fired by SULLIVAN entered BOLGER's back.

FEDERAL TORT CLAIMS ACT

136.    Under the FTCA, DEFENDANT is liable for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where DEFENDANT, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.  28 U.S.C. § 1346(b).

36

137.    The FTCA is a limited waiver of the government's sovereign immunity.  In part, the FTCA's liability and jurisdiction-conferring language provides that federal district courts have exclusive jurisdiction over claims against DEFENDANT for money damages for personal injury or death caused by the negligent or wrongful act or omission of federal employees under circumstances where DEFENDANT, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.  See 28 U.S.C. § 1346(b)(1).

138.    Under the FTCA, plaintiffs may sue DEFENDANT in federal court for state-law torts committed by government employees within the scope of their employment.  28 U.S.C. §§ 1346(b), 2671-2680.

139.    In *Indian Towing Co., Inc. v. United States*, 350 U.S. 61, 68-69, 76 S.Ct. 122 (1955), the Supreme Court stated "[t]he broad and just purpose which the [FTCA] was designed to effect was to compensate the victims of negligence in the conduct of governmental affairs in circumstances like unto those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws."

140.    In Arkansas, there exist causes of action based on state law include the Arkansas Wrongful Death statute and Arkansas' Survival statute, which are statutory causes of action, and causes of action based on common law, including torts such as negligent supervision.  These are causes of action for which private persons in Arkansas can be subject to liability, especially when their conduct has unreasonably caused injury or otherwise jeopardizes public safety.

## COUNT I—UNITED STATES
## FTCA—WRONGFUL DEATH AND SURVIVAL
## ARKANSAS STATE STATUTORY LAW

141.    PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one-hundred and forty (140) above as and for Paragraph one-hundred and forty-one (141) of Count I.

142.    At all relevant times, in Arkansas, there existed a Wrongful Death statute, codified at Ark. Code. Ann. § 16-62-102(a) and (b), as well as an accompanying statute commonly referred to as a "Survival statute," found at Ark. Code Ann. § 16-62-101(a)(1).

143.    PLAINTIFF brings Count I pursuant to the Arkansas Wrongful Death statute which provides for damages whenever the death of a person shall be caused by a wrongful act, neglect or default of another person.  PLAINTIFF also brings Count I pursuant to the Arkansas Survival statute which provides for damages for wrongs done to a person and further provides that such an action may be brought after the death of the person by his executor.

144.    On August 20, 2017, SULLIVAN owed BOLGER a duty to maintain public order and to enforce at all times all such laws, ordinances and regulations for the preservation of good order and the public welfare, including the duty to follow all such laws, ordinances and regulations. Moreover, SULLIVAN and COLE owed BOLGER the duty of ordinary care.

145.    On August 19-20, 2017, SULLIVAN was guilty of one more of the following negligent acts which proximately caused BOLGER's death:

    a)  <u>Negligence in the preparation for the public safety sweep</u>, including, but not limited to: parking an unreasonably long distance from the potential scene of accident; failing to familiarize himself with weapon/equipment; violating NPS MVR/AVRD policy; failing to devise plan for a medical emergency; and failing to remedy COLE's malfunctioning radio or alerting a supervisor to the malfunctioning radio;

    b)  <u>Negligence during his approach to Campsite #3</u>, including, but not limited to: failing to assign or adequately communicate the

respective roles of SULLIVAN and COLE prior to engagement; failing to safely approach scene; failing to identify himself as Park Ranger; and failing to utilize police presence as a deterrent or alternative to the use of physical force; and

c) <u>Negligence in the shooting of BOLGER</u>, including, but not limited to: unreasonably shooting and killing BOLGER without legal justification; violating the Fourth Amendment of the U.S. Constitution for which there can be no discretion; failing to warn BOLGER that he intended to use deadly force, despite ample time for such a warning; the negligent use of deadly force; and failing to safely engage visitors during public safety patrol.

146.    The above negligent acts and omissions caused injury because, at the very minimum, they were performed with laziness, haste, distraction or inattention, none of which reflects the kind of considered judgment grounded in social, economic and political policy the FTCA's discretionary act exception is intended to protect.

147.    By reason of the wrongful death of BOLGER, he and his heirs have incurred pecuniary damages and severe mental anguish.  On August 20, 2017, prior to his death, BOLGER suffered personal injuries and great pain proximately caused by the wrongful acts and/or omissions of SULLIVAN, which included the shooting BOLGER multiples times, and which survive his death.

148.    By reason of the neglectful acts of SULLIVAN, BOLGER incurred personal injuries and great pain as well as damages in the form of loss of life.

149.    The negligence of DEFENDANT was wrongful as a tort under the law of Arkansas and without excuse or justification under any applicable state statute or rule.

150.    WHEREFORE, PLAINTIFF prays for judgment against DEFENDANT in an amount which will fully and fairly compensate him for damages suffered.

## COUNT II—UNITED STATES
## FTCA—INTENTIONAL TORTS OF ASSAULT AND BATTERY
## ARKANSAS STATE STATUTORY LAW

151.    PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one hundred fifty-one (151) above as and for Paragraph one hundred and fifty-two (152) of Count II.

152.    In 1974, Congress amended the FTCA to provide that "investigative or law enforcement officers" can be held liable for assault and battery, *inter alia*. 28 U.S.C. § 2680(h).

153.    Assault is defined in Arkansas as an intentional attempt by a person, by force or violence, to do an injury to the person of another, or as any attempt to commit a battery, or any threatening gesture showing in itself or by words accompanying it an immediate intention, coupled with a present ability, to commit a battery.

154.    Battery is defined in Arkansas as a wrongful or offensive physical contact with another through the intentional contact by the tortfeasor and without the consent of the victim, the unpermitted application of trauma by one person upon the body of another person.

155.    In Arkansas, there exist civil actions for assault and for battery which can subject a private person to civil liability when they engage in the conduct described in the assault and battery state statutes.

156.    On August 20, 2017, SULLIVAN and COLE made threatening gestures toward BOLGER, coupled with an ability to commit a battery—*i.e.* their firearms—which constitutes the tort of assault.

157.    On August 20, 2017, BOLGER suffered physical trauma to his person, including conscious pain and suffering, serious bodily harm and death, caused by the battery committed upon him by SULLIVAN.

158.   Therefore, DEFENDANT is liable to PLAINTIFF in damages, including compensatory damages, actual damages and costs.

WHEREFORE, PLAINTIFF prays for judgment against DEFENDANT in an amount which will fully and fairly compensate him for damages suffered.

### COUNT III—UNITED STATES
### FTCA—NEGLIGENT SUPERVISION
### ARKANSAS STATE COMMON LAW

159.   PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one hundred and sixty (160) above as and for Paragraph one hundred and sixty-one (161) of Count III.

160.   In Arkansas, there exists a civil action premised on the common law tort of negligent supervision which can subject a private person to civil liability when they are found to have committed the tort.

161.   In Arkansas, a negligent supervision claim requires the plaintiff to show that the employer's conduct was a proximate cause of the injury and that the harm to third parties was foreseeable. See *Madden v. Aldrich*, 58 S.W.3d 342, 415 (2001).

162.   The employer is not required to foresee the particular injury that occurred, but only that there is an appreciable risk of harm to others. *Id.* All that is required is a showing that "the employer knew, or in the exercise of ordinary care should have known, that its employee's conduct would subject third parties to an unreasonable risk of harm." See *Kristie's Katering, Inc. v. Ameri*, 35 S.W.3d 807, 813 (Ark. 2000).

163.   Chief Ranger Brandford owed Buffalo River visitors, including BOLGER, a duty to maintain public order and to enforce at all times all such laws, ordinances and regulations for the preservation of good order and the public welfare, including the duty to follow all such laws,

ordinances and regulations.   She owed a duty to use ordinary care in her supervisory responsibilities.

164.    At all relevant times, including August 2017, Chief Ranger Brandford was a commissioned supervisor and SULLIVAN's direct supervisor.

165.    While supervising employees typically involves policy considerations, the Eighth Circuit recognizes that the failure of a supervisor to act after notice of an employee's ongoing misconduct or ongoing threat to public safety is not a supervisory choice based on plausible policy considerations.

166.    As such, there existed a duty on DEFENDANT to ensure that their Park Rangers, such as SULLIVAN and COLE, were properly supervised while performing their duties at the complex on behalf of DEFENDANT.

167.    Chief Ranger Brandford was negligent in failing to ensure that SULLIVAN and COLE had proper training for the duties that Park Rangers could foreseeably be expected to perform in the course of SULLIVAN and COLE's employment with DEFENDANT, especially with regard to public safety sweeps, the use of deadly force and emergency situation protocol.

168.    At all relevant times, including August 20, 2017, the training deficiencies and police misconduct of SULLIVAN and COLE were issues that were ongoing in nature and, therefore, presented an ongoing unreasonable risk to public safety.

169.    When an ongoing danger is known to supervisors, there is no discretion for those supervisors who fail to take remedial measures to correct said danger.

170.    Chief Ranger Brandford was negligent in failing to ensure that SULLIVAN and COLE properly conducted themselves for the duties that Park Rangers could foreseeably be expected to perform in the course of SULLIVAN and COLE's employment with DEFENDANT.

171.    Despite the aforementioned duties, DEFENDANT committed the following wrongful and neglectful acts and/or omissions with regard to SULLIVAN and COLE:

a)  Failing to implement such policies and procedures for the operation and management of Buffalo River as would reasonably protect BOLGER and other visitors from SULLIVAN and COLE;

b)  Failing to properly supervise, investigate, and review the operation and management of the park and the activities and performance of SULLIVAN and COLE as employees;

c)  Failing to warn that Park Rangers are not properly trained;

d)  Failing to implement policy regarding Park Ranger identification;

e)  Failing to mandate policy compliance;

f)  Failing to ensure Park Rangers are familiar with GPS coordinates in Buffalo River;

g)  Allowing SULLIVAN in the field with equipment on which he has never been provided training;

h)  Allowing use of emergency equipment on which SULLIVAN and COLE were not familiar;

i)  Allowing SULLIVAN and COLE to exploit overtime hours and fatigue themselves of mind and body; and

j)  Failing to enforce Buffalo River's MVR/WVR/AVRD policies, knowing said failure emboldens officer misconduct and lessens officer accountability.

172.    By reason of the wrongful acts of Chief Ranger Brandford, BOLGER incurred personal injuries and great pain as well as damages in the form of loss of life.

WHEREFORE, PLAINTIFF prays for judgment against DEFENDANT in an amount which will fully and fairly compensate him for damages suffered.

**COUNT IV—SULLIVAN**
**CAUSE OF ACTION UNDER *BIVENS V. SIX UNKNOWN NAMED AGENTS*
CONSTITUTIONAL LAW**

173.    PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one hundred seventy-two (172) above as and for Paragraph one hundred seventy-three (173) of Count IV.

174.    A plaintiff may bring a Fourth Amendment Section 1983 case against a federal law enforcement officer, such as SULLIVAN.  *Bivens v. Six Unknown Named Agents*, 402 U.S. 388, 91 S.Ct. 1999 (1971).

175.    It was clearly established in August 2017 that a law enforcement officer, such as SULLIVAN, may not use deadly force against a U.S. citizen unless there is an objectively reasonable basis to do so.  *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S.Ct. 1865 (1989).

176.    If feasible, law enforcement officers, such as SULLIVAN, have a duty to warn before utilizing deadly force.  *Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018).

177.    "The requirement that the threat be reasonably perceived as 'immediate' means that if the threat has passed, so too has the justification for the use of deadly force."  *Cole v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) (citing, *Rahn v. Hawkins*, 73 F. App'x 898, 901 (8th Cir. 2003) (*per curiam*)).

178.    SULLIVAN violated BOLGER's Fourth Amendment right to be free of unreasonable seizures of his body through the following unconstitutional acts and omissions:

    a)  Intentionally shot and killed BOLGER;

    b)  Failed to warn BOLGER that deadly force was imminent;

    c)  Failed to afford BOLGER the opportunity to surrender; and

    d)  Failed to identify himself as a law enforcement officer.

44

179.    SULLIVAN used excessive force against BOLGER's person, causing great injury, pain and death.   The force used by SULLIVAN was unnecessary and unreasonable, and BOLGER's great injury, pain and death resulted directly from the use of said force which was excessive.

180.    By reason of the conduct of SULLIVAN, BOLGER and his heirs-at-law were deprived of rights, privileges and immunities secured to them by the Fourth and Fourteenth Amendments to the U. S. Constitution, and laws enacted thereunder.

181.    The violence committed by SULLIVAN, and inflicted upon BOLGER was unnecessary, objectively unreasonable and excessive and was, therefore, in violation of his Fourth Amendment Rights.   Therefore, SULLIVAN is liable to PLAINTIFF in damages pursuant to 42 U.S.C. § 1983, including loss of life, loss of liberty interest, conscious pain and suffering, punitive damages and attorney's fees.

WHEREFORE, PLAINTIFF prays for judgment against DEFENDANT in an amount which will fully and fairly compensate him for damages suffered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, JAMES MICHAEL BOLGER, Personal Representative of the Estate of JONATHAN J. BOLGER, deceased, by and through his attorneys, LAUX LAW GROUP, respectfully seeks judgment as follows:

A.   That the Court assume jurisdiction over this action;

B.   Declare that the acts and omissions described herein violated Plaintiff's rights under the Constitution and Laws of the United States and Arkansas;

C.   Award compensatory damages against each of the defendants herein;

D.   Award punitive damages against Individual Defendants under

federal law;

E.  Provide a trial by jury on Plaintiff's Bivens claim (Count 4);
    and

F.  Such further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Michael J. Laux
Michael J. Laux
W. Dist. Arkansas Bar No. 6278834
One of the Attorneys for Plaintiff
400 W. Capitol Avenue, Suite 1700
Little Rock, AR 72201
Telephone: (501) 242-0750
Facsimile: (501) 372-3482
E-mail: mlaux@lauxlawgroup.com
        mikelaux@icloud.com