IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

JAMES MICHAEL BOLGER, as the
personal representative of the estate
of JONATHAN J. BOLGER, deceased                                PLAINTIFF

V.                           CASE NO: 3:20-CV-3052

UNITED STATES OF AMERICA
and DAVID SULLIVAN, individually                              DEFENDANTS

MEMORANDUM OPINION AND ORDER
DENYING MOTION FOR SUMMARY JUDGMENT

On August 20, 2017, Jonathan Bolger was shot and killed by National Park Service Ranger David Sullivan in the Buffalo River National Forest. Plaintiff James Bolger, on behalf of his brother Jonathan's estate, brought a *Bivens* claim against Ranger Sullivan for violating Jonathan's Fourth Amendment rights by shooting and killing him, as well as claims against the United States under the Federal Tort Claims Act. Ranger Sullivan now moves for summary judgment on the *Bivens* claim on the ground that he is entitled to qualified immunity for shooting Mr. Bolger.[1] Because it was clearly established in August 2017 that law enforcement could not use deadly force against an individual who no longer presented an immediate threat to the safety of others, Ranger Sullivan's Motion for Summary Judgment (Doc. 34) is **DENIED**.

---

[1] The Court considered Ranger Sullivan's Motion for Summary Judgment and accompanying exhibits, Brief in Support, and Statement of Facts (Docs. 34, 35, 36); Plaintiff's Response in Opposition, exhibits, and Response to Ranger Sullivan's Statement of Facts (Docs. 39, 40, 41, 42, 48); and Ranger Sullivan's Reply (Doc. 45).

1

## I. BACKGROUND

The following undisputed facts are taken from Ranger Sullivan's affidavit (Doc. 34-1), Ranger Sullivan's interview with the Investigative Services Branch ("ISB") of the National Park Service (Doc. 41-1), Ranger Sullivan's deposition (Doc. 48), Ashley Santoro's post-shooting interview with law enforcement (Doc. 34-2), video from Ranger Sullivan's body worn camera (BWC),[2] and other uncontroverted evidence in the record.

Jonathan Bolger was camping at the Spring Creek Campground in the Buffalo River National Forest on the night of August 19 and into the morning of August 20. Mr. Bolger was accompanied by his girlfriend, Ms. Santoro, and Ms. Santoro's three children.

On the night in question, Ranger Sullivan and trainee-Ranger Tim Cole were on duty and conducting sweeps of the National Forest's campgrounds to ensure campers were observing quiet hours. The rangers' shift was set to end at 11:30 p.m., but they decided to work overtime and continue their sweeps. (Doc. 41-1, p. 13).

The rangers approached Spring Creek Campground in their truck at approximately 1:30 a.m on August 20. Ranger Cole parked the truck at the edge of the campground, and he and Ranger Sullivan exited the truck. *Id.* at pp. 15–16. They walked to the front of the truck and stood side-by-side, letting their eyes adjust to the darkness and preparing to conduct a foot patrol of the campground. *Id.* at pp. 16–17. They carried flashlights and were armed with their service pistols. Prior to the encounter in question, they had no contact with Mr. Bolger and no complaints had been made about Mr. Bolger. *See* Doc. 48, p. 37.

---

[2] Both Plaintiff and Ranger Sullivan provided the same BWC video as an exhibit. (Docs. 34-3, 41).

Mr. Bolger and Ms. Santoro were sitting at a picnic table at Campsite 3 when they saw a truck coming down the road toward their campsite. (Doc. 34-2, p. 3). Mr. Bolger instructed Ms. Santoro to "tell the kids to be quiet and duck down," which Ms. Santoro did. *Id.* Mr. Bolger stood up and went to find out who was approaching the camp at that late hour. *See id.*

As the rangers stood in the roadway in front of their truck, they heard a voice yell, "Who's over there? Who is that?" (Doc. 41-1, p. 17). Then, the beam from a flashlight illuminated the rangers and was turned off after two to three seconds. *Id* at p. 22. Ranger Cole turned his flashlight on, and Ranger Sullivan saw Mr. Bolger standing approximately 30 feet away. *Id.* at p. 29. According to Ranger Sullivan, Mr. Bolger was pointing something at them, first at Ranger Sullivan and then at Ranger Cole. *Id.* at p. 31. It was later revealed Mr. Bolger possessed a pellet gun that resembled a handgun.

Next, Ranger Cole began yelling "police." *Id.* at 17. Ranger Sullivan drew his service pistol, turned his flashlight on, and started advancing forward and to his right. *Id.* at 31. At that point Ranger Sullivan could see what Mr. Bolger was pointing. He announced "police" and shouted to Ranger Cole, "gun, gun, gun." *Id.* at 17. Mr. Bolger began to back up, moving away from the rangers. *Id.* at 17.

Ranger Sullivan did not activate his BWC until after he shot Mr. Bolger. However, the BWC retains video-only footage for the 30 second period prior to activation. Here, Ranger Sullivan's BWC preserved 10 seconds worth of video prior to his shooting of Mr. Bolger.[3]

---

[3] Timestamps from the BWC video are noted in parentheses. The video is 27 minutes and 42 seconds long. It begins at timestamp 06:34:38, and Mr. Bolger is shot at approximately 06:34:49. It includes the approximately 10 seconds that precede Ranger

3

At the beginning of the video, Mr. Bolger stands approximately 15 to 20 feet from Ranger Sullivan with both arms at his sides. (06:34:39). He is shirtless and wears shorts. He faces toward Ranger Sullivan—at a slight angle—and is five to six feet from the driver-side door of his pickup truck. (06:34:39–06:34:47). Ranger Cole is positioned off-camera, to Ranger Sullivan's left. (Doc. 41-1, p. 27).



Ranger Sullivan continues moving to his right, with his firearm aimed at Mr. Bolger. (06:34:38–06:34:43). Ranger Sullivan drops his flashlight at the beginning of the video, but his firearm is equipped with a light that continues to illuminate Mr. Bolger. (06:34:39). The video footage does not contain audio, but according to Ranger Sullivan he yelled at Mr. Bolger, "Police, drop the gun," and Mr. Bolger responded, "No, show me your badge." (Doc. 41-1, pp. 25–26). Ranger Sullivan contends he then repeated his command for Mr. Bolger to "drop the gun." *Id.* at 32.

---

Sullivan shooting Mr. Bolger, the shooting itself, and the shooting's aftermath. However, the first 30 seconds of the BWC video lacks audio because Ranger Sullivan had not enabled the feature that records the preceding 30 seconds of audio when activated. (Doc. 41-1, p. 6).

4

A couple of seconds into the video, Mr. Bolger raises his right arm over his eyes, in an apparent attempt to shield his eyes from the light emitted by Ranger Sullivan's firearm. (06:34:41).



It is not clear from the video whether Mr. Bolger holds anything in either hand, but the Court, for the purposes of this Motion, accepts Ranger Sullivan's statements that Mr. Bolger held a pellet gun that resembled a handgun in his left hand up until the point Ranger Sullivan shot him. (Doc. 34-1; Doc. 48, p. 53).[4]

Six seconds after raising his right arm over his eyes, Mr. Bolger turns more than 90 degrees to his left and takes one long stride toward his truck's driver side door. (06:34:47). Mr. Bolger quickly extends his right arm and grabs his truck's door handle.

---

[4] The Court notes, however, that Ranger Sullivan himself has provided contradictory statements on the position of Mr. Bolger's weapon. Now, nearly five years after the encounter, he is sure the weapon was in Mr. Bolger's left hand. But five *days* after the encounter, in his interview the ISB, he was not sure which hand the weapon was in but thought it was most likely the right hand. He stated, "I feel like in my memory that it would be a right hand." (Doc. 41-1, p. 34). He further stated in the interview that, when he recovered the weapon, it "was outside of [Mr. Bolger's] right hand only about two or three inches, laying on the ground." *Id.* at 18.

(06:34:48). At this point, his right side faces Ranger Sullivan, his right arm is outstretched toward the truck, and his left arm remains at his side.



As Mr. Bolger's right hand pulls on the door handle, his back becomes partially turned to Ranger Sullivan. (06:34:48).



At this moment—as Mr. Bolger opens the door of his truck—Ranger Sullivan fires his service pistol repeatedly.[5]

---

[5] The video does not clearly depict the moment Mr. Bolger was shot because the opening of the door activated the truck's lights. Reflections from those lights obscure the video momentarily.

6



Mr. Bolger was struck four times by three bullets and fell to the ground. According to the medical examiner's report, he had entry wounds to the back of his right arm, right upper back, and his right abdominal flank. (Doc. 34-4, pp. 2–3). The final wound was to his left wrist, likely the result of a bullet exiting from the gunshot wound to his right arm or right abdominal flank. *Id.* at 3.

After he shot Mr. Bolger, Ranger Sullivan activated his BWC, which automatically preserved 30 seconds of preceding video and began recording both video and audio. Next, the video shows that Ranger Sullivan approaches Mr. Bolger and picks something up—presumably Mr. Bolger's pellet gun—and carries it a few feet away from Mr. Bolger's body. (06:35:11–06:35:14). The pellet gun was found on the ground by local police, and Ranger Sullivan later speculated that he must have inadvertently dropped it while attempting to place it in the cargo pocket of his pants. (Doc. 41-1, p. 36). After dealing with the pellet gun, Ranger Sullivan handcuffs Mr. Bolger. (06:36:09). The remainder of the video depicts Ranger Sullivan, Ranger Cole, and Ms. Santoro rendering aid to Mr. Bolger. Mr. Bolger died at the scene.

Certain critical facts are disputed by Plaintiff James Bolger, who brings this suit as the duly appointed representative of his brother's estate. More specifically, Plaintiff denies Mr. Bolger had a flashlight, denies Mr. Bolger held or pointed a gun at the rangers, and denies Ranger Sullivan shouted any warnings to Mr. Bolger. However, Plaintiff has no personal knowledge of these events, and he has failed to point the Court to sufficient record evidence to dispute Ranger Sullivan's statements as to these events and Ms. Santoro's statements confirming Mr. Bolger held a pellet gun.[6] Even in cases where law enforcement officers "are the only surviving witnesses," "a nonmoving party may not rely on mere denials or allegations in its pleadings, but must designate specific facts showing that there is a genuine issue for trial." *Hernandez v. Jarman*, 340 F.3d 617, 622 (8th Cir. 2003) (citing *Brandt v. Davis*, 191 F.3d 887, 891 (8th Cir.1999)). Therefore, the Court will assume as true that Mr. Bolger briefly shined a flashlight at the rangers and pointed a realistic-looking handgun at them *before* the BWC began recording, and that prior to the shooting Ranger Sullivan shouted "police," "gun, gun, gun," and "drop the gun."

However, certain other critical portions of Ranger Sullivan's statements are directly contradicted by the events captured on video. In his affidavit, Ranger Sullivan writes that he shot Mr. Bolger because Mr. Bolger "made a sudden movement, turning *towards* me raising his *arms at* me, with the gun still in his left hand." (Doc. 34-1) (emphasis added). The video shows otherwise. And in such cases "the court is not limited to *only* facts

---

[6] Ms. Santoro stated in her interview with police that she heard the rangers ask Mr. Bolger to drop his weapon and Mr. Bolger replied, "Let me see your badge first." (Doc. 34-2, p. 3). She further stated that Mr. Bolger was carrying a pellet gun but had it down at his side as he moved toward his truck. *Id.*

8

provided by" Ranger Sullivan. *Quraishi v. St. Charles Cty., Missouri*, 986 F.3d 831, 836 (8th Cir. 2021) (emphasis in original).

Here, the BWC video directly contradicts Ranger Sullivan's statements with respect to several key facts. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). For at least the 10 second period prior to Ranger Sullivan firing his service pistol, Mr. Bolger was not raising both arms at the rangers. As the video clearly reflects, Mr. Bolger's right arm was positioned across his face—shielding his eyes—for eight seconds prior to the shooting. During this period nothing was pointed at the rangers. In fact, Mr. Bolger's left hand—that was holding the weapon—never left his side. Mr. Bolger did make a sudden move, but that movement was with his right arm and hand as he reached for his truck's door handle. To the extent this is the sudden movement Ranger Sullivan is recalling, Mr. Bolger was not raising his right arm "at" Ranger Sullivan. Just the opposite. The video shows Mr. Bolger turning away from—not toward—the ranger.

When a video of an event exists and a party's "version of events is so utterly discredited by the record that no reasonable jury could have believed him," the Court must "view[] the facts in the light depicted by the videotape." *Scott*, 550 U.S. at 380–81; *see also Wallingford v. Olson*, 592 F.3d 888, 893 (8th Cir. 2010) (disregarding the plaintiff's "version of the material facts" because the defendant officer's dashcam video blatantly contradicted the plaintiff's account). Therefore, to the extent Ranger Sullivan's statements conflict with the BWC video, the Court declines to adopt Ranger Sullivan's version.

9

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). In order for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"Qualified immunity protects public officials from § 1983 damage actions if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To determine if an official is entitled to qualified immunity, we must determine whether the alleged facts

demonstrate that the official's conduct violated a constitutional right, and whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Groenewold v. Kelley*, 888 F.3d 365, 370–71 (8th Cir. 2018). Where the record does not conclusively establish the lawfulness of an officer's use of force, summary judgment on the basis of qualified immunity is inappropriate. *Nance v. Sammis*, 586 F.3d 604, 612–13 (8th Cir. 2009).

### III. DISCUSSION

### A. Violation of Constitutional Right

Claims alleging law enforcement used excessive force are analyzed under the objective reasonableness standard for Fourth Amendment seizures. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The objective reasonableness of an officer's use of force is judged "from the perspective of a reasonable officer on the scene and turns on those facts known to the officer at the precise moment he effectuated the seizure." *Cole ex rel. Est. of Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) (cleaned up). The Court must consider "the totality of the circumstances, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade by flight.'" *Nance*, 586 F.3d at 610 (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009)). "Absent probable cause for an officer to believe the suspect poses an immediate threat of death or serious bodily injury to others, use of deadly force is not objectively reasonable." *Banks v. Hawkins*, 999 F.3d 521, 525 (8th Cir. 2021) (cleaned up).

When he was killed, Mr. Bolger had not been placed under arrest, (Doc. 48, p. 40), and he was not suspected of committing any crime, apart from the actions that purportedly

11

created the threat to the rangers (pointing an apparent firearm and not following all their commands).[7] The crux of the analysis, then, is whether there was probable cause to believe Mr. Bolger posed an immediate threat to the safety of Ranger Sullivan or Ranger Cole at the moment Ranger Sullivan shot him.

When deadly force is used against an individual who allegedly posed an immediate threat of violence, the Eighth Circuit instructs district courts to consider whether a weapon was pointed at anyone or used in a menacing fashion; whether the threat—and thus the justification for use of deadly force—was no longer present at the moment deadly force was used; and whether law enforcement provided a warning that deadly force would be employed. *Hutchins*, 959 F.3d at 1132–33.

In *Hutchins*, the Eighth Circuit affirmed the district court's finding that Officer Hutchins was not entitled to qualified immunity for shooting and killing Roy Richards. Richards and his uncle, Darrell Underwood, were fighting in Underwood's front yard sometime after midnight, and Underwood's neighbors called 911. After police arrived on scene, the two men continued fighting for about 10 more seconds. Underwood then went to his front porch, and Richards went to his vehicle and retrieved what appeared to be a rifle (but was actually a pellet gun). Richards then walked toward the porch, "holding the gun vertically facing either the sky or the ground." *Id.* at 1132. As Richards was approaching, Underwood went into the house and closed the door. Then, Richards turned around and walked back towards his car. A few seconds later, Officer Hutchins shot and killed Richards.

---

[7] It is not a crime to merely possess a handgun—or a pellet gun—in in the Buffalo National Forest. (Doc. 48, p. 27).

12

The Eighth Circuit held that it was not objectively reasonable for Officer Hutchins to have shot Richards given "the facts known to Officer Hutchins at the precise moment he" fired. *Id.* at 1133 (cleaned up). The court emphasized that Richards' "gun [was] pointed either toward the ground or the sky," and he "was not pointing the weapon at Underwood or wielding it in an otherwise menacing fashion." *Id.* The court noted Officer Hutchins failed to provide a warning before shooting despite it being feasible to do so. *Id.* The Eighth Circuit also emphasized that Richards was "visibly retreating" from Underwood's door at the time he was shot. *Id*. Based on these facts, the Eighth Circuit held that in the moment he shot Richards, "Officer Hutchins did not have probable cause to believe Richards posed an immediate threat of serious physical harm to Underwood," and shooting Richards under those circumstances violated Richards' Fourth Amendment rights. *Id*.

Here, "at the precise moment" Ranger Sullivan used deadly force, the following facts would have been known to a reasonable officer in Ranger Sullivan's position:

- Ranger Sullivan and his partner had approached a campsite in the middle of the night for a routine patrol;

- An unknown-to-them individual—Mr. Bolger—asked them to identify themselves and pointed an apparent firearm at them;

- They informed Mr. Bolger they were law enforcement officers;

- Ranger Sullivan aimed his service pistol at Mr. Bolger and ordered him to drop his weapon;

- Mr. Bolger began to retreat, asked the rangers for identification, and lowered his weapon—which was in his left hand—to his side;

- The setting was dark. Mr. Bolger was illuminated by the rangers' flashlights. Mr. Bolger raised his right arm over his eyes; and

- Mr. Bolger reached with his right arm toward his truck. In so doing, his body turned more than 90 degrees counterclockwise *away* from the rangers.

At the moment Ranger Sullivan shot Mr. Bolger, the immediate threat of serious physical harm from Mr. Bolger had passed. Mr. Bolger lowered his weapon to his side after learning the rangers were law enforcement, and he never raised his weapon again. In *Hutchins*, the prior threat "was no longer present when Officer Hutchins chose to shoot [Richards], as upwards of five seconds elapsed between when Richards retreated from Underwood's door and turned toward his vehicle and when Officer Hutchins opened fire." *Id.* Ranger Sullivan similarly opened fire more than 10 seconds after Mr. Bolger had lowered his weapon and just as Mr. Bolger began to turn his back to the rangers.

Ranger Sullivan stated he intended "to take a shot way earlier . . . as . . . [the weapon] was pointed at Tim," but he had trouble holding both his handgun and flashlight at the same time. (Doc. 41-1, p. 33). After he dropped his flashlight, he was able to properly hold his handgun with both hands and shoot Mr. Bolger. *See id.* Had he shot Mr. Bolger when Mr. Bolger's weapon was aimed at Ranger Cole, his use of deadly force may have been objectively reasonable. Instead, Ranger Sullivan shot Mr. Bolger after the immediate threat had passed.

Mr. Bolger's sudden turn away from the rangers to open his vehicle door did not create a new immediate threat to the safety of the rangers. The act of fleeing itself does not create such a threat. *See Capps v. Olson*, 780 F.3d 879, 886 (8th Cir. 2015) ("The use of deadly force against a fleeing suspect who does not pose a significant and

14

immediate threat of serious injury or death to an officer or others is not permitted."). "A reasonable fact finder could thus conclude that [Mr. Bolger] was fleeing arrest at the time that he was shot rather than engaging" in a conflict with the rangers. *Wallace v. City of Alexander, Arkansas*, 843 F.3d 763, 769 (8th Cir. 2016).

Ranger Sullivan's admitted failure to warn Mr. Bolger that deadly force was going to be used "adds to the unreasonableness" of Ranger Sullivan's actions. *Hutchins*, 959 F.3d at 1133 (citing *Ngo v. Storlie*, 495 F.3d 597, 602 (8th Cir. 2007)). Ranger Sullivan had more than 10 seconds after seeing Mr. Bolger point his weapon at the rangers to give an explicit deadly force warning. *See id.* (finding a warning feasible where there was "five to ten seconds from when [the officer] saw Richards emerge from behind his vehicle with a gun to when he shot Richards"). Nevertheless, the Court recognizes Ranger Sullivan "did not merely stand silent before shooting" Mr. Bolger. *Est. of Morgan v. Cook*, 686 F.3d 494, 497–98 (8th Cir. 2012). He warned Mr. Bolger to drop his weapon multiple times,[8] which significantly lessens the weight normally accorded to this factor in the analysis. *See id.* at 498.

This case is distinguishable from those Ranger Sullivan relies on. In *Loch v. City of Litchfield*, the Eighth Circuit affirmed the district court's grant of qualified immunity for an officer who used deadly force against a suspect the officer reasonably thought was armed and advancing toward the officer. 689 F.3d 961, 964–67 (8th Cir. 2012). The officer had responded to a "report of an intoxicated man attempting to leave in a vehicle," and upon arriving on scene, the officer learned the man had a firearm. *Id.* at 966. The officer

---

[8] Ranger Sullivan also shouted "gun, gun, gun," but that message was directed at Ranger Cole.

15

observed the man confront another individual in a "nose-to-nose" argument. *Id.* When the officer ordered the man to get on the ground, the man advanced toward the officer and said "something that included the word 'kill.'" *Id.* at 964. While advancing, the man slipped on snow and his hand moved toward his side, and the officer shot him. The man had previously thrown his firearm into the snow, but the officer did not know that at the time he fired.

Here, Mr. Bolger made no verbal threats of violence, never advanced on the rangers, and the rangers were not responding to a call expecting to find a volatile situation. Nor were the rangers "in the area to watch for armed suspects and . . . knew they might encounter a dangerous situation." *Nance*, 586 F.3d at 611.

In *Aipperspach v. McInerney*, the Eighth Circuit affirmed the grant of qualified immunity for an officer "confronted with a suspect who held what appeared to be a handgun, refused repeated commands to drop the gun, pointed it once at [an officer], and then waved it in the direction of officers deployed along the ridge line in an action they perceived as menacing." 766 F.3d 803, 807 (8th Cir. 2014). Officers had responded to a call reporting a man was refusing to leave a friend's apartment. Dispatch informed the officers there was an arrest warrant for the man. When the officers arrived, the man had fled into the nearby woods, and officers pursued. They discovered the man at the bottom of a ravine. When the officers asked the man "to come up and talk," he produced what appeared to be a black handgun. *Id.* at 805. It was later revealed to be a pellet gun. Additional officers encircled the man along the ridge surrounding the ravine. The man was pointing the gun at his own head, but at one point pointed it at an officer. The officers ordered the man 12 times to drop his weapon and told him they would use deadly force

if he pointed it at them again. *Id.* When the man slipped, he "swung [the gun] up and around, pointing [it] in the direction of the officers on the ridge." *Id.* Seven of the officers shot and killed the man.

Mr. Bolger was not suspected of committing any prior crimes, did not appear suicidal or emotionally unstable, was not resisting arrest, and did not raise or wave his weapon in the moments before he was shot. Mr. Bolger was turning away from the rangers, and the immediate threat he posed to the safety of the rangers had passed.

The Court therefore concludes Ranger Sullivan lacked probable cause to believe Mr. Bolger posed an immediate threat to the safety of himself or Ranger Cole in the moment he fired.[9] As a result, Ranger Sullivan's use of deadly force was not objectively reasonable under the circumstances.

### B. Clearly Established Right

Mr. Bolger's right to be free from excessive force under these circumstances was clearly established in August 2017. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable offic[er] would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While the inquiry "must be particularized to the facts of the case," *White v. Pauly*, 137 S. Ct. 548, 552 (2017), Plaintiff "does not have to point to a nearly identical case on the facts for the

---

[9] This would be a different case if the facts had unfolded as Ranger Sullivan remembers: Mr. Bolger suddenly turned towards Ranger Sullivan while raising both arms at the ranger—including the arm holding an apparent firearm. The Court discussed above why this version of events contradicts the record, and the Court must view the facts as depicted in the video. But even if the Court were to agree Ranger Sullivan's account is one a reasonable jury could accept after viewing the video, it at most creates a genuine issue of material fact as to whether a reasonable officer would perceive Mr. Bolger's final movements as presenting an immediate threat. In any event, then, summary judgment for Ranger Sullivan would be inappropriate.

17

right to be clearly established," *Banks*, 999 F.3d at 528. Instead, the question is "whether prior cases would have put a reasonable officer on notice that the use of deadly force in these circumstances would violate [Mr. Bolger's] right not to be seized by the use of excessive force." *Craighead*, 399 F.3d at 962.

In *Hutchins*, the Eighth Circuit found that in October 2016 the law was clearly established in two relevant respects:

> First, it was clearly established that a person does not pose an immediate threat of serious physical harm to another when, although the person is in possession of a gun, he does not point it at another or wield it in an otherwise menacing fashion. Second, it was clearly established that a few seconds is enough time to determine an immediate threat has passed, extinguishing a preexisting justification for the use of deadly force.

959 F.3d at 1134 (collecting cases). Based on this definition, the *Hutchins* court found Officer Hutchins violated Richards' clearly established right to be free from excessive force. Hutchins shot Richards when Richards' firearm was not pointed at anyone, Richards was retreating, and the previous threat had passed. *Id.* at 1133.

In *Banks*, the Eighth Circuit similarly found:

> Applying the appropriate level of specificity here, we conclude that a reasonable officer had fair warning in February 2017 that he may not use deadly force against a suspect who did not present an imminent threat of death or serious injury, even if the officer felt attacked earlier and even if he believed the suspect had previously posed a threat.

999 F.3d at 529 (collecting cases). The *Banks* court applied this definition to find an officer had violated a man's clearly established right to be free from deadly force when, at the moment the officer fired, the unarmed man "opened [a] door with some force after shouting an expletive," did not move toward the officer, an unknown object hit the officer in the head, and "that all this was happening at the scene of a suspected domestic

disturbance that was no longer volatile and that [the officer] had not witnessed." *Id.* at 527.

The definitions of the clearly established right from both *Hutchins* and *Banks* control this case. In the moment Ranger Sullivan shot Mr. Bolger, Ranger Sullivan's justification for deadly force had been extinguished because Mr. Bolger had lowered his weapon to his side after the rangers had issued warnings. "[I]t was clearly established that mere seconds" was enough time for Ranger Sullivan "to conclude the immediate threat ha[d] passed." *Hutchins*, 959 F.3d at 1135 (citing *Ludwig v. Anderson*, 54 F.3d 465 (8th Cir. 1995)). Mr. Bolger was in possession of an apparent firearm but did not point it or wield it menacingly for at least the 10 seconds that preceded him being shot. Mr. Bolger also made a movement away from the rangers, reaching out with the hand Ranger Sullivan knew did *not* have a weapon in it. On summary judgment review, the Court concludes that this movement did not create an immediate threat. Absent such a threat, it was clearly established in August 2017 that deadly force could not be used, and Ranger Sullivan is not entitled to qualified immunity for his actions.

## IV. CONCLUSION

For these reasons, Ranger Sullivan's Motion for Summary Judgment (Doc. 34) is **DENIED**.

**IT IS SO ORDERED** on this 28th day of March, 2022.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE